WEST END DOCK v. STATE. (No. 5426.)

(Court of Civil Appeals of Texas. Austin. Feb. 3, 1915.)

1. NAVIGABLE WATERS ⊗═══9—CHANNEL AND DOCK COMPANIES—GRANT OF LANDS FROM STATE—NATURE OF TITLE.

Under Rev. St. 1911, arts. 1249–1251, relating to the creation and powers of channel and dock companies, where defendant corporation was chartered to dredge a channel across Galveston Bay, it did not acquire the title to the property granted in its charter by making a survey of the proposed channel and mapping its course, but merely acquired a special right of user in such property on the implied condition that it be subjected to such use within a reasonable time.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 26–29; Dec. Dig. ⊗═══9.]

2. NAVIGABLE WATERS ⊗═══9—CHANNEL AND DOCK COMPANIES—GRANT OF LANDS—NECESSITY FOR USER.

Under Rev. St. 1911, arts. 1249–1251, relating to the creation and powers of channel and dock companies, a quasi public corporation, organized to dredge a channel across Galveston Bay and given by charter certain rights of user in flats, etc., has no right to hold such property indefinitely while remaining inactive.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 26–29; Dec. Dig. ⊗═══9.]

3. NAVIGABLE WATERS ⊗═══9—CHANNEL AND DOCK COMPANIES—PUBLIC GRANTS—EFFECT OF NONUSER.

A quasi public corporation, organized to dredge a channel across Galveston Bay and given certain rights of user in flats, etc., by public grant in its charter, forfeits whatever rights thereto it may have acquired by its charter and survey of the proposed channel, if it neglects for an unreasonable period to dredge the channel; the state having the right to reassert its original claim to the subject-matter of the grant, which is subject to defeasance by implied condition subsequent—i. e., nonuser by the corporation.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 26–29; Dec. Dig. ⊗═══9.]

4. CORPORATIONS ⊗═══596—CHANNEL AND DOCK COMPANIES—FORFEITURE OF CHARTER FOR NONUSER—STATUTE.

Under Rev. St. 1911, art. 1205, providing that, "where a corporation created under this title or a general law of this state shall fail to commence active operations within three years, its charter is hereby forfeited," a quasi public corporation, organized to dredge a channel across Galveston Bay, that has received grants of public lands, has failed to exercise its corporate franchise, and has rendered future exercise impossible by a sale to railroads of its property in the granted lands, will forfeit its charter at the instance of the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2386, 2387; Dec. Dig. ⊗═══596.]

5. APPEAL AND ERROR ⊗═══548—REVIEW—NECESSITY FOR STATEMENT OF FACTS AS BASIS FOR REVIEW OF FINDING BELOW.

In an action by the state against a quasi public corporation to oust it from its franchise for nonuser for an unreasonable time, in the absence of a statement of facts on appeal, the court cannot review a finding below as to the unreasonableness of the time for which the alleged nonuser was continued.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 2433–2440; Dec. Dig. ⊗═══548.]

6. CORPORATIONS ⊗═══596—CHANNEL AND DOCK COMPANIES—PUBLIC GRANTS—FORFEITURES —CREDITORS' RIGHTS.

Where no showing is made upon its dissolution for nonuser of its franchise that there are debts owing by a quasi public corporation, organized to dredge a channel across Galveston Bay and granted public lands in its charter for that purpose, a judgment for the state for the land involved is proper.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2386, 2387; Dec. Dig. ⊗═══596.]

Appeal from District Court, Travis County; Chas. A. Wilcox, Judge.

Action by the State against the West End Dock, a corporation. From a judgment forfeiting and canceling its charter, defendant appeals. Affirmed.

G. E. Mann, of Galveston, for appellant. B. T. Looney, Atty. Gen., G. B. Smedley, Asst. Atty. Gen., and Lewis Fisher, of Galveston, for the State.

KEY, C. J. The state of Texas, acting by its Attorney General, brought this suit against the West End Dock, a private corporation, and obtained a judgment forfeiting and canceling the charter of the defendant and awarding to the state certain land and premises described in the state's petition, and the defendant has appealed.

There is no statement of facts, and the case is presented in this court on the trial judge's findings of fact and conclusions of law, which are as follows:

"Findings of Fact.

"1. I find that the land involved in this suit is comprised of certain submerged flats or land covered by the shallow waters of Galveston Bay, situated on the north side of Galveston Island, and being particularly described in plaintiff's petition, to which reference is here made.

"2. That on the 25th day of May, 1897, the defendant incorporated under chapter 16, title 25, under the corporate name of West End Dock, and was authorized by its charter to construct a channel from the deep water known as 'Galveston Channel,' in Galveston Bay, to the railroad bridge across Galveston Bay known as the 'La Porte Bridge'; said charter provid-

⊗═══For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

ing that said. channel was to be not less than 150 feet in width and not less than 15 feet in depth. The southerly edge or bank of said channel was to begin at the northwest corner of the property of the Galveston Wharf Company.

"3. Soon after the incorporation of the defendant company its officers and agents were instrumental in having the United States harbor line changed from the point where it was located at the time defendant's charter was issued to a point in said bay about 1,200 feet farther north.

"4. Soon after its incorporation the defendant caused a survey to be made of its proposed channel, which survey designated a channel 500 feet wide, with a right of way 700 feet wide on each side of said channel, said channel and right of way extending from the property of the Galveston Wharf Company on the east in a southwesterly direction over said submerged flats to the La Porte Bridge on the west, a distance of about 2½ miles. Maps were caused to be made of said survey, which maps were filed in the office of the county clerk of Galveston county and with the Railroad Commission of Texas, and also in the state land office.

"5. Thereafter, during the years 1897 to 1899, the defendant corporation engaged in certain litigation with what was known as the Galveston City Company, which latter company owned certain lands adjoining the Galveston Wharf Company's property, which litigation involved the north line of the said City Company's property, and which north line conflicted with certain of the. territory embraced in the defendant company's survey. In this litigation the defendant corporation incurred considerable expense. The litigation was terminated about the year 1899. On the ——— day of ———, 19—, the defendant corporation donated to the Southern Pacific Railway all of that portion of the territory embraced within its charter and survey extending from its eastern limits in a westerly direction about three-quarters of a mile, and executed to said railway company a deed to such portion of the flats claimed · by the defendant company. The Southern Pacific Railway Company afterwards constructed docks and railway terminals on a portion of said property, over one-half of same, however, remaining undeveloped."

"7. In May, 1905, the defendant corporation executed a deed to the Rock Island Company, conveying nearly one-half mile of its right of way as surveyed, beginning at the west line of the property theretofore conveyed to the Southern Pacific Railway Company and extending west. In consideration for said conveyance the Rock Island paid to the defendant the sum of $2,750 in cash, the same being the amount estimated to be necessary to cover the expense the defendant had incurred in making the survey of its route and in procuring its charter, in the litigation with the Galveston City Company, expenses in endeavoring to have the United States harbor line changed, and all other expenses and costs which had been incurred by the defendant up to that time. The Rock Island has not improved this property.

"8. On the 14th day of October, 1907, the defendant corporation entered into a contract with the Bowers Southern Dredging Company, whereby the said dredging company, in consideration of the use of the material to be taken from said channel, agreed to dredge the channel of the West End Dock to a depth of not less than 12 nor more than 25 feet below mean low tide, and a width not to exceed 500 feet. I find that said dredging company had certain contracts which required that it procure material for filling in certain low lands along the shore, and that said contract was made principally in order to provide material for such purpose; it not being contemplated by the parties that a channel suitable for use should be made. Said dredging company did remove material

from a small portion of said channel, but not to an extent sufficient to aid in the use of same ·for navigation.

"9. At the time of the incorporation of said company the channel constructed by the United States government, and known as the 'Galveston channel,' and which is used by vessels coming to and leaving the port of Galveston, had been constructed to a point near the east end of the survey made by the defendant company. Said deep water channel has been extended in a westerly direction north of the property owned by the Southern Pacific Railway Company to a point near an extension of the dividing line between said Southern Pacific property and the Rock Island property. It is also shown that it is contemplated by the United States government that said channel extend further west along the north boundary of the property owned by the Rock Island Railway Company. The property now claimed by the defendant company does not reach the Galveston channel, and if the Galveston channel is extended west as contemplated it could be reached by the defendant company only by changing the course of the channel as originally surveyed by it, so as to make same curve in a northerly direction through the northeasterly portion of the property designated in defendant's survey as its right of way.

"10. The property described in defendant's charter and in its survey does not touch the shore line at any point. The defendant company does not own or control any land upon the shore, and it is contemplated by the defendant company that their docks shall be constructed on either side of its proposed channel on the 700 feet designated as right of way.

"11. The defendant corporation had done no dredging or work of construction of any kind on the property claimed by it, with the view of constructing channel or docks, with the exception of making the survey as above set out, and has no plans looking to a development of the property at any time in the immediate future.

"12. I find that the storm of 1900 interfered materially with the development of the city of Galveston for several years succeeding, and rendered it more difficult than would have been the case otherwise to organize and finance new commercial and business institutions. I further find that the city of Galveston is at present supplied with docks and wharves reasonably adequate for the present needs.

"13. The island of Galveston has a large frontage on natural deep water channel of Galveston Bay owned by Galveston Wharf Company and developed into docks. East of this the Gulf, Colorado & Santa Fé Railroad owns approximately 2,650 feet of frontage, one dock constructed, balance unimproved; and east of this the Galveston City Company owns approximately 2,200 feet of channel frontage, nine of which has been improved. On the other or north side of said natural channel, the city of Galveston owns Pelican Island and flats, with a considerable frontage on the said channel, and none of this has been made into docks."

"14. The docks and wharves of the Galveston Wharf Company were greatly injured by the storm of 1900, but were thereafter reconstructed and enlarged. Since the date of the incorporation of the defendant company, wharves and docks have been constructed at Texas City, and at Bolivar, both on Galveston Bay and near the city of Galveston.

"15. The defendant corporation has not regularly held its directors' meetings and stockholders' meetings, sometimes two or three years elapsing between such meetings, the officers of said company have not been elected regularly, and no regular minutes have been kept. Said corporation has no real property and no personal property other than probably $——— in cash, which represents the sum paid on its capital stock.

"16. I find that much more time has elapsed

from the date of the incorporation of the defendant company than was reasonably necessary in which to construct and put in operation its channels and docks.

## "Conclusions of Law.

"1. I conclude that under the facts stated the defendant corporation, by reason of its procuring a charter and making the survey as above set out, did not acquire a fee simple title in and to the property described in said charter and embraced in said survey, but only acquired the right to use said property for channel and dock purposes, provided said property was subjected to such uses within a reasonable time.

"2. I conclude that such corporations have no legal right under our statute to impound and hold property suitable for the construction of channels and docks for an indefinite period, and until such time as the directors of such corporations may believe that the demands of commerce would justify the construction of such channels and docks.

"3. I further conclude that whatever right the defendant company may have acquired by reason of its incorporation and survey has been forfeited on account of its failure to make use of said property within a reasonable time, and that the state is entitled to recover said property free from any and all claims of the defendant company.

"4. I further conclude that by reason of the fact that the defendant company has failed to make use of its corporate franchises, and has put itself in a position where it will be impossible for it to so use them in the future, its charter should be forfeited.

"C. A. Wilcox, District Judge."

## Opinion.

[1-4] We approve and adopt the conclusions of law so tersely and accurately expressed by the learned trial judge. The case involves the proper construction of chapter 16 of title 25 of the Revised Statutes, and especially article 1250, which chapter and article relate to the subject of channel and dock corporations. Articles 1249, 1250, and 1251 read as follows:

"Art. 1249. This chapter shall embrace and include the creation of private corporations for the purpose of constructing, owning and operating deep water channels from the waters of the Gulf of Mexico along and across any of the bays on the coast of this state to the mainland, for the purposes of navigation and transportation, and for the construction, owning and operating docks on the coast of this state for the protection and accommodation of ships, boats and all kinds of vessels for navigation and their cargoes.

"Art. 1250. Every such channel corporation shall, in addition to the powers herein conferred, have power:

"1. To cause such examination and survey for its proposed channel to be made as may be necessary to the selection of the most advantageous route for such purpose, by its officers, agents or servants; to enter upon any of the waters of such bays and upon any of the lands of this state, or of any person.

"2. To take and hold such voluntary grant of real estate and other property as shall be made to it to aid in the construction and maintenance of its deep water channel and works pertinent thereto.

"3. To construct its channel across, along, through, or upon, any of the waters of the bays within the jurisdiction of this state, and so far into the mainland as may be necessary to reach a place for its docks that will afford security from cyclones, storms, swells and tidal waves, with such depth as may suit its convenience and the wants of navigation, not less than five feet and a width of not less than forty feet.

"4. To furnish to vessels and boats adapted to the purpose facilities for navigating in and along the entire length of its channel and to charge and collect a toll therefor, to be prescribed and established by its by-laws, not to exceed one cent per barrel bulk of the capacity of each vessel for each mile of the length of its channel used by the vessel going either way.

"5. To borrow such sums of money as may be necessary for constructing, finishing, or operating its channel, and to issue and dispose of its bonds for any amount so borrowed, and to mortgage its corporate property and franchises to secure the payment of any debt contracted for the purposes aforesaid: Provided, that damages for any property appropriated by such corporation shall be assessed and paid for as is provided for in case of railroads.

"6. To enter upon and condemn and appropriate any lands of any persons or corporation that may be necessary for the uses and purposes of such channel corporation; the damages for any property thus appropriated to be assessed and paid for in the same manner as provided by law in the case of railroads: Provided that no damages shall be assessed against or paid by it for any portion of the route of the channel embraced within and covered by the waters of any bay or lake on the coast of this state, nor for any portion of any island belonging to the state that may be requisite and necessary to the construction and successful operation of its channel; and provided, further, that its right of way shall not be less than the actual width of its channel, and not more than seven hundred feet in width on each side of its channel: Provided that when the land sought to be condemned under this chapter is arable land, such right of way shall not extend further than six hundred feet on each side of the channel from edge or boundary of said channel.

"7. To construct, own, and operate its channel so far into the waters of the Gulf of Mexico as may be necessary to obtain an adequate depth of water at its gulf entrance to facilitate the ingress and egress of such vessels as may navigate the same in so far as this state may have the power to grant such right, which shall be in subordination to that of the government of the United States, in so far as that government has the constitutional power to control the same.

"Art. 1251. Every such dock corporation shall, in addition to the powers heretofore conferred, have power:

"1. To purchase, take and hold such land or real estate as shall be necessary for the construction and operation of its docks, approaches, entrances, moorings and ways and the construction, use and enjoyment of such warehouses, stores and sheds as may be necessary to the receiving and discharging of freights, goods, wares and merchandise, and the proper protection and preservation thereof; provided, that no such dock corporation shall ever have the right or power to take or condemn to its use any private property without the free consent of the owner thereof, expressed by a sufficient deed in writing.

"2. To construct its dock or docks in such manner and of such size and depth as it may deem meet and proper to suit the convenience of such vessels as may see fit to use and occupy the same, and to collect from the vessels using the same, or from their masters, owners or consignees, such sum or sums for the use thereof as may be authorized by its by-laws and agreed to by such masters, owners or consignees.

"3. To borrow such sums of money as may be necessary for constructing, completing or operating its dock or docks, and to issue and dispose of its bonds for such amount so borrowed, and to mortgage its corporate property and franchises to secure the payment of any debt contracted for the purposes aforesaid."

It is contended on behalf of appellant that a proper construction of these articles should result in a holding that appellant had acquired a fee-simple title to the property in controversy, and therefore judgment should have been rendered against the state as to any right to recover the property. We are unable to give sanction to that contention, and concur with the trial court in holding that appellant never acquired a fee-simple title to the property, but only the right to use it for channel and dock purposes. We also concur in the holding that the right of user for the latter purpose was not perpetual, and was lost by the failure to exercise it within a reasonable time. In determining the legislative intent and ascertaining whether or not that intent was to authorize a corporation or any one else to impound and hold property suitable for the construction of channels and docks for an indefinite and unreasonable period, the surrounding circumstances, as well as the language of the statute, should be considered. While channels and docks may be constructed for private gain, when the Legislature deals with that subject its motive should be (and in this instance no doubt was) the promotion of the public good; and therefore, unless the plain language of the statute admits of no other construction, it should not be so interpreted as to place it in the power of any one to prevent the construction of channels and docks, and thereby retard instead of promote the public interest. For instance, suppose there had been no channels and docks at the port of Galveston and appellant had acquired the same right that it has in this case to all the property suitable for the construction of channels and docks, and had then refused to construct any or to permit anyone else to do so. In such case, if the statute is to be construed as conferring a fee-simple title it would result in placing it in the power of a single corporation to seriously handicap, if not entirely destroy, a seaport. There is nothing in the language of this statute requiring it, and therefore we decline to adopt such a construction. On the other hand, to construe the law as conferring only a right of user within a reasonable time results in no injustice to appellant, and, instead of impairing, it promotes, the public welfare.

[5] It is also contended by appellant that the court erred in finding that it had failed to exercise its right of user for an unreasonable time; but, in the absence of a statement of facts, that contention cannot be sustained. Counsel for appellant refers to certain other findings of the court which it is claimed tend to furnish an excuse for not having heretofore constructed a channel or dock; but there may have been other testimony showing ample ability and willful and capricious refusal to do so.

As to that portion of the judgment which forfeited appellant's charter, it is sufficient to say that it was authorized by that portion of article 1205 of the Revised Statutes which reads:

"Where a corporation created under this title or a general law of this state shall fail to commence active operations within three years after filing its charter with the secretary of state, its charter is hereby forfeited, and the corporation is dissolved."

We are of opinion that the facts found by the trial court show that appellant failed to commence active operations within three years after filing its charter, and therefore the state was entitled to a decree canceling the charter, although it may have been dissolved by force of the statute and without any judicial proceeding. Those things which the findings show appellant did within the time referred to fall short of being active operations in the construction of a channel or dock, and therefore they do not militate against the court's finding of fact upon that subject.

[6] As to the contention that the court should not have rendered judgment for the state for the land involved, but should have appointed a receiver to administer the property for the benefit of creditors, it is sufficient to say that it is not shown that the corporation owed any debts or that there was any necessity for taking action looking to the protection of creditors. Furthermore, creditors could have no greater right in the property than appellant had, and as it had by nonuser forfeited all of its rights to the property, its creditors, if any there be, have no claims upon this property.

All the questions presented in appellant's brief have been considered, and our conclusion is that no ground for reversal is shown, and therefore the judgment is affirmed.

Affirmed.