CHAS. T. CRARY v. PORT ARTHUR CHANNEL AND DOCK COMPANY.

No. 708. Decided November 21, 1898.

**1. Corporation—Ship Channel—"Along Bay" Includes Along Shore of Bay.**

A corporation created under article 721, Revised Statutes, for the purpose of constructing, etc., a deep water channel and docks on the coast of Texas, under the power, given by section 3 of article 722, Revised Statutes, to construct its channel "along a bay," may construct same and condemn land therefor along the shore thereof, and is not limited to a construction through or upon the waters of the bay. (Pp. 281, 282.)

**2. Same—Construction Inland.**

The power to so construct and condemn land therefor is also maintainable under the authority given by the same section of the statute to construct "so far into the mainland as may be necessary to reach a place for its docks that will afford security from cyclones," etc. (P. 282.)

**3. Same—Ship Channel—Starting Point—"Waters of Gulf."**

Article 721, Revised Statutes, authorizing the creation of a corporation to construct a channel "from the waters of the Gulf of Mexico," embraces and authorizes one having its initial point upon a bay or inlet of the gulf coast subject to ebb and flow of tide. (Pp. 282, 283.)

**4. Same—Case Stated.**

The P. A. C. & D. Co., appellee, was incorporated under articles 721, 722, Revised Statutes, to construct a ship channel commencing on Sabine Pass, an inlet nine miles long, at a point four miles from its mouth in the gulf, running thence three miles inland to the shores of Sabine Lake, then upon and skirting the shore thereof for a half mile, and gradually diverging therefrom northwesterly to the town of Port Arthur, the site of the company's proposed docks, crossing Taylor's Bayou, a navigable stream, about 2000 feet from its mouth. Held, that such incorporation was authorized by Revised Statutes, articles 721, 722, and the company had power thereby to condemn land for such proposed channel. (Pp. 277-283.)

**5. Eminent Domain—Condemnation—Ship Channel—Consent of Government.**

The fact that the consent of the Secretary of War to the construction of a proposed ship channel in Texas was necessary and had not yet been obtained, would not avail a land owner as ground of objection to condemnation proceedings. (P. 283.)

**6. Eminent Domain—Necessity for Condemnation.**

The power granted such corporation to condemn land for a channel so far inland as to reach a place of safety for its docks was a privilege to and not a restriction

upon the rights of the company. The corporation may judge of such necessity and need not show it in order to condemn. (Pp. 283, 284.)

### 7. Statutory Construction.

See opinion for application of canon of construction requiring a distinct meaning to be given to every word of statute. (P. 281.)

QUESTIONS CERTIFIED from the Court of Civil Appeals for the First District, in an appeal from the County Court of Jefferson.

*Votaw, Martin & Chester* and *A. H. Willie & Sons*, for appellant.—It is not lawful to commence the construction of or to construct an embankment, channel, or other work, under the act of the legislative assembly of the State of Texas, until the location and plan of such embankment or channel has been submitted to and approved by the Secretary of War of the United States, or to excavate or fill or in any manner alter or modify the course, location, condition, or capacity of any channel or of any navigable water of the United States, unless approved and authorized by its Secretary of War. Act July 13, 1892, sec. 7, chap. 158, Supp. Rev. Stats. U. S., Vol. 2, p. 30; Vol. 1 Supp. Rev. Stats. U. S., chap. 907, p. 800.

A channel for the purpose of navigation, connecting itself with the waters of the Gulf of Mexico, or any bays on the coast of the State of Texas, in purview of chapter 14, title 21, of the Revised Statutes of the State of Texas, 1895, can only be constructed with reference to waters of the bays, etc., within the jurisdiction of the State of Texas. Rev. Stats., art. 722; Pasch. Dig., art. 351; United States v. State of Texas, 162 U. S., 1; Ryan v. Brown, 18 Mich., 196; Buchner v. Railway, 14 Am. and Eng. Ry. Cases, 447; Rev. Stats., art. 721 et seq.; Cool. Const. Lim., 66.

Corporations created under chapter 14, title 21, of the laws of the State of Texas, Revised Statutes of 1895, are delegated the power to construct their channels across, along, through, or upon any of the waters of the bays within the jurisdiction of this State. Rev. Stats. 1895, sec. 3, art. 722, and authorities cited above.

Corporations incorporated under chapter 14, title 21 of the Revised Statutes of Texas, 1895, are delegated the power to condemn land for the purpose of reaching a safe place for docks, only so far into the mainland as shall be necessary in order reach such docks. Rev. Stats. 1895, art. 722, sec. 3, and the authorities cited above.

Under chapter 14, title 21, Revised Statutes of Texas, 1895, a corporation for channel purposes can condemn for the purpose of its channel in the mainland, only at points and so far as may be necessary to reach a place of safety for docks, and evidence on the trial for the purpose of condemning a right of way between the channel company and the riparian owner, which would show the proposed construction unnecessary for the purpose of reaching such docks, is admissible under proper allegations for the purpose of defeating the action. Rev. Stats. 1895, art. 721, et seq.

The power of eminent domain can not be exercised by a corporation incorporated under chapter 14, title 21, Revised Statutes of Texas, 1895, for the purpose of constructing a safe channel inland, or for the purpose

of constructing a channel at all, except as incident to and for the sole purpose of reaching docks. Rev. Stats. 1895, art. 721, et sq.

It is contrary to the law of the United States for any person or corporation to deposit, by any process whatever, mud, sand, dredging, or other kind of matter, in the waters of any harbor, river, bay, or lake of the United States, for the improvement of which money has been appropriated by Congress, without the permission of the Secretary of War of the United States. Rev. Stats. U. S., Supp., vol. 2, p. 251, chap. 299, sec. 6; Id., p. 30, chap. 158, sec. 7; Id., vol. 1, p. 800, chap. 907.

*Greer & Greer,* for appellee.

*Coke & Coke,* for appellant, also filed brief and argument in support of a motion for rehearing, which was overruled.

GAINES, CHIEF JUSTICE.—The Court of Civil Appeals for the First Supreme Judicial District has certified for our determination the following questions:

"The Port Arthur Channel and Dock Company was organized as a private corporation under the general laws of this State for the purpose expressed in the second article of its charter, as follows:

" 'Second—the purposes for which this corporation is formed are to construct, own, and operate a deep water channel from the waters of the Gulf of Mexico at Sabine Pass, along and across Sabine Lake on the coast of Texas, to a point on the main land at or near the town of Port Arthur, in the county of Jefferson and State of Texas, for the purposes of navigation and transportation, and to construct, own, and operate docks along the coast of the State of Texas, at or near said channel, for the protection and accommodation of ships, boats, and all kinds of vessels for navigation, and their cargoes, with full authority to exercise all of the rights and privileges described by chapter 14 of said title 21 of said Revised Statutes of Texas, and all acts amendatory thereof and supplemental thereto.'

"It seeks to condemn land belonging to the appellant through which to cut its proposed channel, and this appeal is from a judgment of the County Court of Jefferson County by which the land was condemned.

"Sabine Pass connects Sabine Lake with the Gulf of Mexico. It is about nine miles long, is of an average width of four-fifths of a mile, and has an average depth of thirty feet. Sabine Lake is a much larger body of water. From Mesquite Point at its exit into the pass the Texas shore of the lake runs for some distance almost due west, and then trends in a northwesterly direction and finally in a northeasterly direction until Port Arthur is reached, which is situated near the shore of the lake. Appellee proposes to cut its channel from a point on Sabine Pass about four miles from its entrance into the Gulf of Mexico and then inland to Port Arthur. The proposed route running from Sabine Pass enters the mainland immediately and runs thence in a north-

westerly direction, departing from the course of the Pass and approaching the shore of the lake, which it reaches at about the distance of three miles from the beginning. It runs along the shallow edge of the lake the distance of about one-half of a mile, the right of way extending into the water, but the channel proper being on the shore, and then gradually diverges from the shore line until it reaches Taylor's Bayou, which it crosses about 2000 feet from its mouth, and continues thence in a northeasterly direction to the town of Port Arthur. The land sought to be condemned lies from the beginning point at Sabine Pass to the place where the line strikes the lake, and from this place to its northern end the channel is wholly upon the land of appellee, and appellee's projected docks at Port Arthur will be upon its own land.

"Taylor's Bayou empties into Sabine Lake and is wholly within the State of Texas. It is a navigable stream for about twenty-five or thirty miles from its mouth. It is about 300 feet wide and twenty-five feet deep, but at its mouth in the lake the water is only three and a half feet deep, and vessels drawing a greater depth can not enter it.

"The channel is inland entirely within the State of Texas. Its general course is that of the shore of the lake along and near which it runs. It will be about nine miles long, twenty-four feet deep, and 183 feet wide, except at its mouth at Sabine Pass, where it will be 250 feet wide. The topography of the country over which the route lies is low and level. Destructive storms of more or less violence have visited Sabine Pass. Shipping in the stream and houses in the town have been destroyed by storms with great loss of life to the people. Bodies of persons drowned and debris have been thrown upon the northern shore of the lake as far north as the place where Port Arthur now is.

"Appellant in its answer pleaded that in order to give appellee the right to construct its channel it was necessary for it to first obtain the permission of the Secretary of War as provided by Act of Congress, which had not been done. To this the court below sustained a demurrer by the appellee, and no proof of such consent was made.

"The disposition of the case involves the determination of the following questions which are certified to the Supreme Court for their decision:

"1. Has the appellee authority under the law providing for the creation of channel and dock corporations to cut its channel inland along the proposed route; or must the channel be confined to the waters of the lake?

"2. In order to authorize the appellee to maintain its suit to condemn the land of appellant for the construction of its channel, is it necessary for it first to obtain the permission of the Secretary of War as prescribed by Act of Congress? Or can appellant raise the question in this proceeding?

"3. In order to give the appellee the right to condemn the land of appellant for the construction of its channel, must it show that such condemnation is necessary to enable the appellee to reach a place of safety for its docks?"

In 1874 our Legislature enacted a general law authorizing the creation of private corporations for certain specified purposes. Laws 1874, p. 120. In this act authority was given for the organization of corporations for "the construction of canals for the purpose of irrigation or manufacturing purposes." No authority was given for creating a corporation for the construction of deep water channels for the purpose of navigation, unless it was conferred by the last subdivision of section 4 of the act. That section specifies in twenty-seven subdivisions the several purposes for which corporations may be created, the last of which reads as follows: "27. For any other purpose intended for mutual profit or benefit not otherwise especially provided for, and not inconsistent with the Constitution and laws of this State." The Constitution of 1876 provided that private corporations should only be established by general laws; and in the Revised Statutes of 1879, the act was embodied as title 20, with some omissions made necessary by other limitations in the organic law. In that title, section 4 was incorporated as article 566. It seems that the subject of deep water channels received neither the attention of the Legislature which passed the original act, nor of that which enacted the Revised Statutes of 1879. Article 566 was amended in 1885, but not only was there no express authority given by the amended article for incorporating companies for the purpose of making deep water channels or canals for navigation, but subdivision 27, quoted above, was wholly omitted. Under that subdivision only was any authority conferred for creating corporations for the purpose of constructing canals or deep water channels for navigation; and no authority whatever was given for condemning land for such purposes.

But at the session of the Legislature which was held in 1887, a change of legislative policy was manifested, for which it is not difficult to account. A few months previous to that session a disastrous storm had visited our coast and had destroyed much property and many lives. Not many years before a disaster probably still more serious had occurred. Not only was much property destroyed and many lives lost, but one of our most flourishing seaport towns was completely swept out of existence. In the interval between the two there were, as we recollect, one or more similar disasters, which were not so great, but which were sufficient to admonish our legislators of the danger of building up towns upon our low lying and storm-swept coast; and to suggest the policy of encouraging by appropriate laws the deepening of our waterways and the digging of canals through which the shipping of the gulf could pass and reach more elevated ground, where the danger would be materially lessened if not altogether avoided.

The Twentieth Legislature, which met in 1887, passed two acts relating to the subject under consideration,—both as amendments or additions to title 20 of the Revised Statutes,—which was the then existing general law which authorized the creation of private corporations and defined their powers and duties. The first was passed March 23, 1887, and amended article 566, which, as we have seen, enumerated the pur-

poses for which such corporations could be created. Where the previous law read, "The construction of and maintenance of canals for the purpose of irrigation or for manufacturing purposes," the amendment read, "The construction and maintenance of canals for the purpose of irrigation, navigation or manufacturing." Laws 1887, p. 41. Again, in the amendment another subdivision was inserted which is as follows: "25. The construction of harbors and canals on the coast of the Gulf of Mexico." A few days after the passage of this amendment the second law last referred to was enacted. This statute defined the special powers and liabilities conferred upon "deep water channel" and "dock companies" on the coast of the Gulf of Mexico. This last act was amended in 1895, but the amendment only affected the question of the width of the strip of land which "deep channel" corporations were permitted to condemn for their rights of way. As so amended, it was incorporated in our present Revised Statutes as articles 721 and 722. Article 722 was again amended by an act which took effect in the month of March, 1897. It is now the existing law upon the subject, and the law which we are called upon to construe.

Articles 721 and 722, as amended, in so far as the latter bears upon the questions certified, are as follows:

"Article 721. This title shall embrace and include the creation of private corporations for the purpose of constructing, owning, and operating deep water channels from the waters of the Gulf of Mexico along and across any of the bays on the coast of this State to the mainland, for the purposes of navigation and transportation, and for the construction, owning, and operating docks on the coast of this State for the protection and accommodation of ships, boats, and all kinds of vessels for navigation, and their cargoes."

"Article 722. Every such channel corporation shall, in addition to the powers herein conferred, have power:

"1. To cause such examination and survey for its proposed channel to be made as may be necessary to the selection of the most advantageous route for such purpose by its officers, agents, or servants to enter upon any of the waters of such bays and upon any of the lands of this State, or of any person.

"2. To take and hold such voluntary grant of real estate and other property as shall be made to it to aid in the construction and maintenance of its deep water channel and works pertinent thereto.

"3. To construct its channel across, along, through, or upon, any of the waters of the bays within the jurisdiction of this State, and so far into the mainland as may be necessary to reach a place for its docks that will afford security from cyclones, storms, swells, and tidal waves, with such depth as may suit its convenience and the wants of navigation, not less than five feet, and a width of not less than forty feet."

*       *       *       *       *       *       *       *

"6. To enter upon and condemn and appropriate any lands of any persons or corporation that may be necessary for the uses and purposes

of such channel corporation, the damages for any property thus appropriated to be assessed and paid for in the same manner as provided by law in the case of railroads; provided, that no damages shall be assessed against or paid by it for any portion of the route of the channel embraced within and covered by the waters of any bay or lake on the coast of this State, nor for any portion of any island belonging to the State that may be requisite and necessary to the construction and successful operation of its channel; and provided further, that its right of way shall not be less than the actual width of its channel, and not more than 700 feet in width on each side of its channel; provided, that when the land sought to be condemned under this chapter is arable land, such right of way shall not extend further than 600 feet on each side of the channel from the edge or boundary of said channel.

"7. To construct, own, and operate its channel so far into the waters of the Gulf of Mexico as may be necessary to obtain an adequate depth of water at its gulf entrance to facilitate the ingress and egress of such vessels as may navigate the same in so far as this State may have the power to grant such right, which shall be in subordination to that of the government of the United States in so far as that government has the constitutional power to control the same."

1. The first question is in substance whether or not the Port Arthur Channel and Dock Company has authority to construct its channel along its proposed route, and we are of opinion that it must be answered in the affirmative. It is urged in argument that the word "along," as used in article 721 and subdivisions 3 of article 722, means along and upon the waters of the bay, and it is claimed that in construing the word the other prepositions used in the disjunctive in the subdivision mentioned should be looked to and the rule "noscitur a sociis" should be applied. On the contrary, we think that the canon of construction which requires a distinct meaning to be given to every word is more properly applicable to the phrase in question. It is true that "through the waters" and "upon the waters" mean practically the same thing. A channel through the water must be upon the water and one upon the water must be through the water in any ordinary meaning which can be attached to these terms. So also it is quite clear that the word "across" might have been omitted without changing the meaning of the language employed. It is not so, however, with the word "along." "Along a bay" may mean along the waters of the bay. If such was the meaning of the word, it might have been dropped out of the statute in question without in any manner affecting its sense. But it does not follow that because one word in a statute or other writing may be omitted without changing the sense, another should be omitted, which in one of its meanings adds nothing to the construction, while in another it enlarges the scope of the language. A statute which authorizes the construction of a railroad along a river means that the road is to be constructed on the land near to and in the general direction of the river. A statute giving a right to construct a channel for navigation along a body of water may mean either that it is

to be dug under the water lengthwise of the lake, bay, or stream, as the case may be, or upon the land alongside of it. The meaning must be determined in every case by the context and the general purpose of the enactment. Unless we give the word "along" the latter construction in the statute in question, we must say that the Legislature has employed a term which is mere sound and signifies nothing. Again, as may be seen from what has already been said, we are of the opinion that the history of the country and that of the legislation upon this subject tends to show that in the enactment of the laws in question the Legislature was impelled by an earnest desire to encourage the opening of waterways to the gulf, and thereby to promote the commerce of the State. Such being the case, it is not reasonable to conclude that it was the purpose to hamper enterprises of the character of that in question, by throwing around them restrictions for which no necessity exists. There may be points upon our coast at which it is feasible to dig and maintain a channel upon land and not practicable to open and maintain one wholly through the water. If it be to the public interest to permit corporations to be created to open channels through the water, why not upon the land? The only difference we can see is that in the one case it may be necessary to condemn private property and in the other it may not. But why should there be hesitation on this account? Property in this State can not be taken for a public use without making full compensation to the owner for its value, and to him and all others who suffer any special damage by the construction or operation of the work, payment in full for such damage.

But again, if the words "across, along, through, or upon any of the waters of the bays," etc., standing alone, would not confer the right to cut a channel upon the land by the side of the bay, we are of the opinion that the authority given by the subdivision under consideration to construct "so far into the mainland as may be necessary to reach a place for its docks that will afford security from cyclones," etc., is sufficient to confer the power to cut the channel in question. The statute prescribes no length of the channel through the water, and permits it to be constructed sufficiently far into the mainland to reach a place of safety—without prescribing any direction which it shall take. Any channnel through the mainland connecting with the waters of the gulf must, upon a flat coast, of necessity enter the waters for some distance so as to reach the open sea. It follows in our opinion that a channel which commences at the waters of Sabine Pass and penetrates the mainland to the point of safety is a compliance with the law, whether it runs wholly on the mainland or partly on the land and partly through the waters of the lake. That the channel was not to be confined to the waters is also shown by that provision in subdivision 6 of article 722, which confers the right to take land upon any island belonging to the State without making compensation therefor.

But it is also insisted that the channel in question is not authorized by the statute, for the reason that it does not start "from the waters of

the Gulf of Mexico," as prescribed in article 721. The contention seems to be that by "the waters of the gulf" is meant the gulf itself. But we think the language in question is far more comprehensive than it would have been had the statute read "from the Gulf of Mexico." We are clearly of the opinion that the terms are sufficiently broad to embrace at least all bays, inlets, and streams upon the gulf coast to the extent to which they are subject to the ebb and flow of the tide. We are also of the opinion that we should take judicial notice that the tide ebbs and flows through Sabine Pass. Peyroux v. Howard, 7 Pet., 724. From these conclusions it follows, as we think, that a channel which proceeds from Sabine Pass proceeds from "the waters of the gulf" within the meaning of the provision under consideration.

2. We are also of the opinion that the second question propounded by the Court of Civil Appeals should be answered in the negative. It occurs to us that if the appellant has the right to say that, since the appellee has not yet obtained the consent of the Secretary of War for the construction of its proposed works, it has no authority to condemn his land, the secretary may with equal propriety withhold his consent until the land is condemned. So, again, one proprietor whose land is sought to be condemned for the construction of a canal, railroad, or other like public improvement, might with as much reason urge that his property ought not to be taken, because the right to use other land necessary to the completion of the work had not been acquired. It is evident that under that rule no enterprise of the character of that in question could be prosecuted to a successful end where two proprietors, whose lands were necessary to the work, would seek to obstruct it. Besides, if the consent of the Secretary of War be not obtained, it does not follow that the United States would see proper to interfere with the construction or use of the channel. Should the government, after appellant's property has been taken, see proper to obstruct the enterprise and prevent either the completion of the work or the use of the channel, the land would be discharged of its burden and he would enjoy it in full property without restoring the compensation which had been paid him. The Legislature has authorized the company, upon the filing of its charter and the completion of its organization, to condemn lands for the purposes of its incorporation, and in our opinion, the consent of the Secretary of War to the construction of the works upon the navigable waters of the pass and lake is a matter with which the appellant has no legal concern.

3. In providing in the third subdivision of article 722 that a channel corporation shall have the right to construct its channel "so far into the mainland as may be necessary to reach a place for its docks that will afford security from cyclones, storms, swells, and tidal waves," the Legislature, as we think, intended to confer a privilege and not to place a restriction upon such corporations. To have required that a place of absolute safety should be reached, would, in most instances, have required the impossible and would have rendered the whole legislation nugatory. The corporation of all persons, natural or artificial, is most interested in

the safety of its docks, and its interest would in every case lead it to select a locality as safe as practicable. The meaning of the language, in our opinion, is the same as if the statute had read, "and so far into the mainland as the corporation may deem necessary," etc. We therefore answer the third question in the negative.

In the case of Davis against this appellee (87 Federal Reporter, 512), the United States Circuit Court of Appeals for the Fifth Circuit held in accordance with our views upon the first question. We infer from the briefs in that case that the question of the consent of the Secretary of War was before the court, but it seems that evidence was introduced to show that his consent had been obtained. Whether the court held that consent was shown or that it was not necessary we are unable to determine, since the question is not treated in the opinion.